IN RE APPLICATION FOR DISCIPLINE OF
FRANCIS LEON BARTHOLET.

198 N. W. 2d 152.

May 19, 1972—No. 42819.

*Herbert C. Davis,* for R. B. Reavill, State Administrative Director on Professional Conduct.

*Thuet, Todd, Collins & Mitchell* and *Paul A. Thuet, Jr.,* for respondent.

PER CURIAM.

This matter is before this court on a petition by the State Board of Law Examiners for the disbarment of Francis Leon Bartholet as an attorney at law in the State of Minnesota.[1]

The Honorable Irving C. Iverson, Judge of the District Court of the Fourth Judicial District, was appointed referee to hear and report the evidence and to make findings and recommendations. The referee filed his findings and report on April 27, 1971. The matter was thereafter presented to this court en banc on January 4, 1972.

Our studied consideration of the extensive record leads us to adopt the findings of the referee, which will be abbreviated in this opinion. The findings compel the conclusion that Francis Leon Bartholet has inexcusably failed to conduct himself in the manner consistent with fundamental ethical principles of the legal profession. We hold that the record requires his disbarment, and it is so ordered.

Respondent Bartholet was the probate judge of Dakota County from the date of his appointment, September 1, 1965, to the acceptance of his resignation by the Governor on April 30, 1969. He had tendered his resignation on April 21, 1969, contemporaneously with, and as a condition of, a negotiated plea of guilty on two counts of violation of the Minnesota Election Law, Minn. St. 210.20, and to one count of asking and receiving compensation in excess of that allowed by law to a public officer, § 609.45. He has not engaged in the practice of law since his resignation.

The accusation of unprofessional conduct, as the proceedings that had led to his indictment by a grand jury, arose out of his actions as probate judge with respect to the estate of one Marjorie C. Mears, decedent, during the period of June 28, 1966, to February 10, 1967. The evidence credited by the referee established, independent of the statutory

---

[1] By order dated December 16, 1970, the functions of the Board of Law Examiners relating to discipline of attorneys were assumed by the State Board of Professional Responsibility.

offenses acknowledged by respondent in his negotiated plea of guilty, that respondent, in willful disregard of his fiduciary obligations as a judicial officer, mulcted the Mears' estate through the conduit of judicially appointed appraisers from whom he asked and received kickbacks of appraisal fees authorized by him.

The initial hearing on the petition for probate of decedent Mears' will occurred on June 28, 1966, at which time respondent, as the probate judge, knew, or should have known, that decedent's estate had very substantial assets. Ignoring the request of counsel for the estate for consultation on the appointment of appraisers, respondent forthwith appointed two appraisers: Kenneth M. Truax and T. H. Freiling. Truax was at that time a probation officer and referee of the juvenile court of Dakota County, and his salary was established by recommendation of respondent and approval of the Board of County Commissioners for Dakota County. Freiling, an insurance agent and broker, had never before served as an appraiser. He was at that time a member of the board of county commissioners, which board, except for respondent's salary, established and approved the operating budget of the probate and juvenile courts for Dakota County.

Respondent asserted a bona fide belief, based on the generalized statement of assets and liabilities in the petition for probate filed on April 11, 1966, and heard on June 28, 1966, that the Mears' estate was probably insolvent. Even so, it is clear, from specific information disclosed to respondent on July 5, 1966, incident to a million dollar statement of claim made by the First National Bank of St. Paul, that he could not thereafter have believed that the estate was insolvent or other than, as decedent's husband had stated at the first hearing, a "sizeable estate." On October 4 or 5, 1966, counsel for the estate petitioned for permission to invest estate cash in municipal bonds and other securities not statutorily authorized for investment by executors, affirmatively disclosing that this cash—in excess of $8,000,000 and the major asset of the estate—had been made available from the sale of Buckbee-Mears stock, closely held stock that recently had been authorized for public sale. Respondent without any doubt then knew the multimillion dollar character of the estate.

Shortly thereafter, on approximately November 17, 1966, respondent appointed John T. McDonough, judge of the probate court for Washington County, as a third appraiser. Notwithstanding that the value of the stock had been reliably determined in the market, respondent's ostensible reason for appointing McDonough was to provide the estate with his technical competence in its appraisal.

The appraisal of the estate by McDonough took place on December 8 and by Truax and Freiling on December 9, 1966. The appraisers at no time discussed the matter with each other and made no physical inspection of any of the properties in the estate. Except for a brief and apparently general conversation with representatives of the corporate executor, each of them signed the appraisal submitted to them by the executor. The appraisal fee authorized by respondent was .2 of 1 percent of the assets of the estate as shown on the inventory and appraisal, or $19,800. This amount was divided equally among the three appraisers, and a check to each in the amount of $6,600 was mailed or delivered on December 15, 1966.

The gravamen of the referee's findings is that, at the time respondent appointed the appraisers or, in any event, at some subsequent time, the payment of their fees as appraisers was subject to an understanding that each would make a "contribution" to the "Citizen's Committee to Keep Judge Francis L. (Frank) Bartholet Probate and Juvenile Judge, Bartholet Volunteer Committee," this personal campaign committee serving as a conduit for payments to respondent for his own personal use. These are the extraordinary circumstances of the payments:

(1) Kenneth M. Truax, at an unspecified date during the period of his appointment, was asked directly by respondent to make a contribution to his campaign fund in the sum of $2,600. The largest political contribution Truax had ever made before that time was $10. Truax wrote a check in the amount requested on December 17, 1966, having then received the appraisal fee by mail, but, at respondent's suggestion, the check was predated to November 15, 1966.

(2) T. H. Freiling, on a date sometime prior to December 20, 1966, was asked by respondent for a campaign contribution, ostensibly because of a campaign deficit. Upon receiving his appraisal fee by mail, Freiling deposited $3,200 with his bank and took the balance in cash. He then, by telephone, asked respondent to stop by his insurance office. Freiling went to respondent's automobile upon his arrival, partly entered the opened door, and held out to respondent a bundle of cash in the amount of $2,200. Respondent made no motion physically to receive the money, so Freiling placed it on the front seat of respondent's automobile. Respondent thereupon drove away. Although the two have since met on several occasions, respondent at no time thanked Freiling for the contribution or otherwise discussed it. The largest campaign contribution made by Freiling at any prior time was $40 or $50.

(3) Judge McDonough's contribution to respondent's campaign committee was in the amount of $1,800 and was for stated reasons different

from those of the other appraisers. He had been hospitalized for back surgery in December 1966 and had requested respondent to serve as his substitute for the probate court of Washington County. Respondent served as McDonough's substitute for 5 or 6 weeks. McDonough, at some time in January 1966, assertedly told respondent that he wished to compensate him for those services, and respondent requested that this should take the form of a contribution to his campaign fund because of his campaign deficit. McDonough, of course, had been paid his appraisal fee, and he had funds on deposit in his bank. However, McDonough took out a bank loan, taking the proceeds in the form of a cashier's check payable to the order of "Bartholet for Judge Volunteer Committee," which he then mailed to respondent.

These methods of making contributions were in each case, as the referee found, a device "used by the contributor which tended to disguise the source from which the funds were secured." Some of the cash received from Freiling, the check received from Truax, and the cashier's check were duly deposited to the account of respondent's campaign committee, but a series of checks drawn against that account almost immediately thereafter laid bare the personal use made of those funds by respondent. Notwithstanding respondent's sworn testimony that these contributions had been made solely to cover a deficit in his campaign fund, one of the checks drawn against that account clearly indicated payment of a personal loan incurred by respondent prior to incurring campaign expenses. The payees and amounts of others of such checks are likewise highly suspect. Respondent had been requested by the State Board of Law Examiners to furnish a detailed accounting of the funds received from the three appraisers, but, despite his agreement to do so, he offered no such accounting either to the board or to the referee. His failure to do so, as the referee found, was in these circumstances "indicative of a lack of that integrity and moral character required of attorneys practicing law in this state."

The disbarment of Francis Leon Bartholet, now ordered, is not alone for his guilt of the statutory offenses to which he pleaded guilty. It is not to increase his punishment by adding to the humiliation since suffered by him and his family. It must be understood, moreover, that this severe sanction is not imposed for mistake in judgment in appointing appraisers for reasons other than their competence or in authorizing appraisal fees in amounts grossly disproportionate to the services rendered. Both bench and bar may fairly share in our criticism for such past practice by this and other probate judges. He has been found, rather, to lack that sense of fidelity owed by lawyers and judges in

matters of trust reposed in them by the public, a lack of moral integrity made the more manifest by his found lack of forthrightness in answering to this accusation of unprofessional conduct.

Disbarment ordered.

OTIS, JUSTICE (concurring specially).

The attorneys of Minnesota have encouraged this court to raise their registration fees in order to create a State Board of Professional Responsibility which has instituted these disbarment proceedings. Nevertheless, this case uncovers a deplorable situation for which, as our court points out, the bench and bar must shoulder some of the blame. Endeavors by the organized bar to put an end to the practice of vicarious generosity on the part of probate judges in approving the payment of excessive fees to appraisers have met with little success in the legislature.[1] While we do not suggest that the practice is necessarily wide-

---

[1] Senate File No. 176 introduced at the 1971 session of the legislature failed to pass. It provided in part as follows:

"Section 1. Minnesota Statutes 1969, Section 525.331 is amended to read:

"525.331 [APPRAISAL.] If the inventory lists no property other than moneys of the United States, no appraisal shall be required; otherwise, * * * the representative shall include in such inventory an appraisal of the property comprised therein made by such representative under the penalties of perjury setting forth the fair market values of the various items thereof as of the date of death, or in a guardianship as of the date of the appointment of the guardian as ascertained by such representative to the best of his knowledge, information and belief. Such representative may in his sole discretion engage a special appraiser or appraisers for any item or items of property required to be inventoried and may pay him reasonable compensation for his services. At any time prior to the filing of the inventory, or at any time within six months thereafter, the court may, on its own motion or upon motion made by any interested party and after such notice as the court may require, order and after hearing upon such motion, may appoint one or more special appraisers of the property required to be inventoried or any item or items thereof, if it shall find such appointment to be in the best interests of the estate. Such appointment shall not be made unless it appears to the court that the circumstances are so unusual or extraordinary as to make appraisal by the representative inadvisable. Such appraisers shall be sworn to the faithful performance of their duties and, within three months of their appointment unless

spread, the fact remains that respondent is not the only probate judge who has used his office to curry favor with colleagues, local officials, and friends. Here, a probation officer, a county commissioner, and another probate judge were permitted to receive a total of $19,800 for performing no service whatever beyond signing an inventory which had already been prepared by the executor and its attorneys. As our opinion indicates, none of those appointed examined any of the property which it was their duty to appraise.

Fees which are grossly out of proportion to the time and responsibility expended constitute nothing more than a gratuity, the granting of which is now grounds for disciplinary action against the judge.[2] As long as appraisers are permitted to be paid on a percentage basis, without regard to the time and skill required to perform their duties, courts invite the kind of misconduct which has led to this disbarment. The time is at hand when it is incumbent on our profession, which has unequivocally condemned this indefensible practice, to eliminate it once and for all.

Mr. Justice Kelly took no part in the consideration or decision of this case.

Mr. Justice Todd and Mr. Justice MacLaughlin, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

the court shall grant or order a different period of time, shall set down in figures opposite each item after deducting the encumbrances, liens, and charges, the net fair market value thereof, and file their appraisal with the court. The values determined by such special appraisal shall constitute the appraised value of the item or items involved. Such appraisers shall be allowed such reasonable fees, necessary disbursements, and expenses as may be fixed by the court and be paid by the representative as expenses of administration or guardianship." (Italics omitted.)

[2] Through the joint efforts of the bench and bar, Standards of Judicial Responsibility have been promulgated and were adopted by the Supreme Court of Minnesota on March 29, 1972. Section II B(3) provides a judge should "[e]xercise his power of appointment on the basis of merit, and confine compensation and reimbursement of appointees within the limits of law *and in accordance with the fair value of services rendered.*" (Italics supplied.) Section VIII C permits sanctions against probate judges in the following language: "A judge who violates any of the preceding rules shall be subject to discipline by the Minnesota Commission on Judicial Standards."