## IN THE MATTER OF THOMAS L. YACCARINO, AN ATTORNEY AT LAW.

Argued February 15, 1989—Decided October 13, 1989.

*Richard J. Engelhardt,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Michael D. Schottland* argued the cause for respondent (*Chamlin, Schottland, Rosen, Cavanagh & Uliano,* attorneys; *Michael D. Schottland* and *Charles A. Costanzo,* on the briefs).

PER CURIAM.

This is an attorney-disciplinary case brought against Thomas L. Yaccarino, following proceedings that resulted in his removal from the office of Judge of the Superior Court on December 27, 1985. The judicial-removal case was the subject of a reported decision by this Court, *In re Yaccarino*, 101 *N.J.* 342 (1985). This attorney-disciplinary case was initiated in August 1986 by the Office of Attorney Ethics (OAE), which filed a formal complaint, charging respondent with professional misconduct. The charged misconduct encompasses the same acts that were the focus of the judicial-removal proceedings.

In late September 1986, respondent filed a motion with the Court contesting the OAE's authority to file an ethics complaint against him as an attorney and contending that the principles of *res judicata* and collateral estoppel did not bar a challenge of the facts that had been determined in the antecedent judicial-removal action. The Court denied the motion, but ruled that the parties could present additional evidence and arguments on the issue of mitigation. It directed a panel of the District XIV Ethics Committee (Committee) to hear the case.

The Committee held hearings in June 1987. It accepted as conclusive the findings of fact determined in the judicial-removal case. The main question it considered was whether the proofs offered by respondent established a medical condition sufficient to excuse his unethical conduct. The Committee accepted as uncontradicted the expert testimony of respondent on this issue. The Committee recommended that, under the circumstances, respondent receive a public reprimand.

The matter was then brought before the Disciplinary Review Board (DRB or Board), which heard it in April 1988. In its disposition, the Board divided evenly as to the appropriate discipline. Four members determined that respondent should be disbarred for certain of his misdeeds, while four believed he should receive no more than a public reprimand. Each position was explained by a separate opinion setting forth recommended

findings of fact and conclusions to support the discipline proposed. This appeal followed:

## I.

Respondent contends that his discipline and removal from office as a judge, as reported and explained in our opinion, *In re Yaccarino, supra,* 101 *N.J.* 342 obviate any need to subject him to further discipline for these same unethical acts based on his status as an attorney. The basic question posed by this contention is whether respondent's misconduct in judicial office bears materially on his fitness to practice law. If the judicial misconduct reflects on the fitness to practice law, discipline that is limited only to the judicial office will not necessarily address or protect the public interest that must be considered in determining whether professional discipline should be imposed.

This Court has long recognized that there is a duality of professional responsibility on the part of lawyers who serve in the judiciary. Their professional loyalty runs both to the judicial office in which they serve and the profession of which they are members. Indeed, the status of an attorney as a member of the legal profession is a condition for the holding of judicial office. *N.J. Const.* art. VI, § 6, par. 2 (1947). Thus, if misconduct affects both the judicial office and the professional status of a lawyer, the public interest in both judicial and professional integrity can be implicated by the lawyer's conduct in judicial office.

We have on occasion addressed these concerns and recognized the indivisibility of the responsibility of a lawyer to his or her judicial office and legal profession. In *In re Mattera,* 34 *N.J.* 259, 266–67 (1961), we observed:

> A single act of misconduct may offend the public interest in a number of areas and call for an appropriate remedy as to each hurt. Thus it may require removal from public office. It may also require criminal prosecution. Still further it may require that the roster of attorneys be cleansed of a miscreant. The remedies are not cumulative to vindicate a single interest; rather each is designed to deal with a separate need.

In *In re Vasser*, 75 *N.J.* 357 (1978), this Court found that a judge could be disciplined as a member of the bar for improperly interceding in another court and in using his official stationery for private transactions. The Court said:

> We conclude that respondent's ethical breaches warrant discipline. His ethical misconduct occurred while he held judicial office and was related to that office.... At this critical juncture, when discipline is to be imposed, respondent stands before us only as a member of the bar. The Ethics Committee determined that respondent was guilty as an attorney for derelictions while holding judicial office; he is clearly accountable for this misconduct in his professional capacity as a member of the bar. [*Id.* at 363–64.]

In *In re D'Auria*, 67 *N.J.* 22 (1975), this Court suspended a former judge's law license for six months for improperly having lunch with attorneys who were representing clients in his court. The Court found that the judge's acceptance of gratuities and favors was unethical conduct for which a lawyer could be disciplined. *Id.* at 24–25. Thus, judges who transgress professional ethics standards can be, and have been, disciplined *qua* lawyers.

The courts in a majority of the states have acknowledged, "that an attorney may be disbarred, suspended, or otherwise disciplined for acts of misconduct performed in the exercise of a judicial office." Annot., "Misconduct in Capacity as Judge as Basis for Disciplinary Action Against Attorney," 57 *A.L.R.*3d 1150, 1158 (1974). These cases have concluded that "misconduct in any capacity whatsoever, including a judgeship, reflects upon an attorney's fitness to practice law and is consequently a proper ground for discipline." *Id. See, e.g., In re Littell*, 260 *Ind.* 187, 294 *N.E.*2d 126 (1973) (attorney-judge is subject to the strongest requirements of both disciplinary rules for attorneys and Code of Judicial Conduct and Ethic and so license can be suspended for misconduct as a judge); *In re Bartholet*, 293 *Minn.* 495, 198 *N.W.*2d 152 (1972) (probate judge's conduct in obtaining funds from estate by appointing appraisers from whom he asked and received kickbacks of appraisal fees authorized by him would warrant disbarment); *In re Hasler*, 447 *S.W.*2d 65 (Mo.1969) (attorney corresponding with and having

private meetings and telephone conversation with one party to a divorce suit in which he was the presiding judge found guilty of gross misconduct as both a judge and a lawyer); *Cin. Bar Ass'n. v. Heitzler*, 32 *Ohio St.*2d 214, 291 *N.E.*2d 477, *cert.* den., 411 *U.S.* 967, 93 *S.Ct.* 2149, 36 *L.Ed.*2d 687 (1972) (court found that "[a] member of the legal profession, who is also a judge, may engage in misconduct which not only requires his removal from office, but also requires that disciplinary action be taken against him with regard to his right to practice law after such removal from office."); *Schoolfield v. Tenn. Bar Ass'n.*, 209 *Tenn.* 304, 353 *S.W.*2d 401 (1961) (lawyer found guilty in impeachment proceedings of "reprehensible conduct involving moral turpitude and has demonstrated qualities which make him an unfit person in whom to place the public trust of practicing law" was properly disbarred for such conduct.).

In *In re Alonzo*, 284 *Ala.* 183, 223 *So.*2d 585, *cert.* den., 396 *U.S.* 992, 90 *S.Ct.* 486, 24 *L.Ed.*2d 454 (1969), the Alabama Supreme Court addressed the issue of disbarring an attorney for fraudulent, corrupt activities as a judge. The court found that:

> Where, as here, a member of the bar holding judicial office commits fraudulent, corrupt, and immoral acts by originating an extortion plan prior to entering upon a judgeship, and executes that plan after assuming the powers of the judgeship, by actions that cannot by any stretch of the imagination, rationally be deemed judicial or official acts, and where such judge has been removed from office by due and legal impeachment proceedings prior to disciplinary action by the Bar Association, it would indeed be sadly anomalous to conclude that the Bar could not cleanse itself of such unfit member on any theory that judicial robes protected such conduct. *[Id.* [223 *So.*2d] at 592.]

The court concluded that the remedies of judicial impeachment and attorney discipline are not cumulative but protect different interests. "[T]he interest of the legal profession in the maintenance of decent and honorable conduct of its members was also grievously offended by Alonzo's conduct" and merited his removal from the roll of attorneys. *Id.*

We have done no less. In a case in which a judge was found guilty of crimes involving bribery in connection with his judicial office, we concluded that the judge must not only be removed

from judicial office but must also be disbarred as an attorney. "[N]o discipline short of disbarment would be commensurate with the transgression." *Matter of Coruzzi*, 98 *N.J.* 77, 81 (1984). Moreover, we have recognized in other contexts that an attorney's conduct not directly involving the practice of law may nonetheless bear materially on his professional capacity as a lawyer. Thus, the Court has not hesitated to order disbarment where a lawyer uses his position to advance personal financial interests at the expense of clients. *See, e.g., Matter of Smyzer*, 108 *N.J.* 47 (1987); *Matter of Servance*, 102 *N.J.* 286 (1986); *In re Wolk*, 82 *N.J.* 326, 333 (1980).

In sum, we recognize that an attorney who has engaged in ethical misconduct while serving as a judge may be exposed to professional discipline in his or her capacity as a lawyer. Judicial discipline for such misconduct neither obviates nor forecloses professional discipline.

## II.

The factual and procedural material constituting the record relevant to the current attorney-disciplinary case is found in the Court's comprehensive and detailed opinion determining that, based on misconduct which occurred between 1979 and 1982, respondent be removed from judicial office. *In re Yaccarino, supra*, 101 *N.J.* 342. The judicial-removal proceedings were initiated against respondent through a complaint authorized by the Court in 1984 following two presentments of the Advisory Committee on Judicial Conduct. The complaint charged respondent with ethical misconduct in violation of *N.J.S.A.* 2A:1B-2 and several canons of the Code of Judicial Conduct. A three-judge panel was designated pursuant to *N.J.S.A.* 2A:1B-7. The panel heard the matter between March and May 1984 and issued its findings to the Court in July 1984. The panel found the evidence showed a pattern of misconduct that warranted respondent's removal from the bench. This Court's decision to remove respondent from the bench reflected its independent

assessment of the record, including detailed findings of fact and specific conclusions of law.

Preliminarily, we must advert to the conclusive effect, if any, on these proceedings of our determinations in the judicial-removal case. We have in the context of determining the preclusive effect of prior factual and legal determinations ruled that criminal convictions constitute conclusive determinations of underlying facts necessary to support the conviction. *See Matter of Conway,* 107 *N.J.* 168, 170 (1987); *Matter of Bricker,* 90 *N.J.* 6 (1982); *Matter of Hughes,* 90 *N.J.* 32 (1982). We have ruled also that such criminal convictions are conclusive in judicial-removal proceedings. *See, e.g., Matter of Coruzzi,* 95 *N.J.* 557, 571 (1984). We are similarly of the view that the determinations made in judicial-removal proceedings are conclusive and binding in subsequent attorney-disciplinary proceedings. *See Matter of Coruzzi, supra,* 98 *N.J.* at 80. This is particularly so, as in this case, where the charges are identical and the burden and standard of proof in the antecedent proceedings were at least as protective of the interests of the respondent as they are in the current proceedings. We, therefore, rule that the findings that undergird a determination of judicial misconduct are conclusive in subsequent attorney-disciplinary proceedings.

The judicial-removal case involved several distinct episodes of misconduct, which must be considered selectively in determining their bearing on respondent's capacity as an attorney and his fitness to practice law. We therefore deal initially with respondent's conduct relating to his daughter while she was a student at Stockton State College and with his involvement in two liquor license business enterprises.

## A.

In early March 1981, respondent's daughter, Cynthia, was arrested and charged in municipal court with offenses arising out of her alleged attack on a Stockton State College police

officer who had impounded her unleashed dog. On learning of the arrest some days later, respondent contacted a sergeant of the college police department, identified himself as a Superior Court Judge, and demanded to know the statute that authorized detention of the dog; respondent also told the sergeant that he was a holder of silver and gold P.B.A. cards. On the same day, respondent called the Monmouth County Prosecutor, and requested that he contact the Atlantic County Prosecutor to have him investigate his daughter's arrest. Respondent then spoke with the chief of the college police department and threatened to bring suit against him, the arresting officer, and the college for violation of his daughter's civil rights unless the arresting officer was fired within twenty-four hours. This did not occur, and respondent's daughter then filed two municipal court complaints against the arresting officer. On several occasions thereafter respondent contacted the municipal prosecuting attorney on the pending charges. These charges were heard and dismissed later in the spring of 1981. *See In re Yaccarino, supra,* 101 *N.J.* at 360–62.

We determined in the judicial-removal proceedings that respondent's conduct engineered an undeniable appearance of impropriety, that respondent used the power, authority, and prestige of his office to advance the private interests of his daughter, and that he used his judicial position to influence other public officials' performance of their lawful duties and to interfere with the orderly administration of justice. *Id.* at 362–63.

In the current case, the DRB concluded with respect to this episode that respondent breached his ethical duty to the legal system in his capacities as both attorney and judge.[1] It specifi-

---

[1] As earlier noted, the DRB divided evenly in its recommendation of appropriate discipline, *supra,* at 179 and the respective recommended dispositions were supported by an opinion. The extent of discipline was the major point of difference between the two positions. Hence, reference to the DRB position

cally noted respondent's personal direct and indirect contacts with law enforcement officials that included pointed references to his official judicial position and "his thinly-veiled threats to various law enforcement personnel of the consequences, should they fail to comply with his demands." These, according to the DRB, constituted proof beyond a reasonable doubt that respondent attempted to influence other public officials in the performance of their lawful duties.

The DRB observed:

> Mr. Yaccarino wrongly invoked the prestige of his judicial office in an effort to advance his family's interests. By so doing, he demeaned the judiciary and the profession. Respondent's personal interests and those of his daughter must be subordinate to the public's interest in the fair, impartial, and orderly administration of justice. There is no escape from the conclusion that respondent is guilty of unethical behavior. *See DR* 1–102(A)(5) & (6).

It further observed that respondent "did not heed the admonition of Disciplinary Rule 8–101(A)(1) and (2). A judge or an attorney who either attempts to influence another tribunal or interfere with the prosecution of charges against a family member to advance his private interest, rather than that of the public, deserves discipline," citing *In re Vasser, supra,* 75 *N.J.* at 363.

We agree with this assessment and determination. We conclude that respondent's conduct violates Disciplinary Rules 1–102(A)(5), and (6) and 8–101(A)(1) and (2).

### B.

In the judicial-removal proceeding, the Court found respondent possessed an interest in liquor licenses held by Green Parrot, Inc., and Montego Bay, Inc. He purposely failed to disclose his stock ownership in the corporations and engaged in a conscious effort to conceal his interests in both enterprises, thus violating *N.J.S.A.* 33:1–25 and 33:1–26. 101 *N.J.* at 366,

---

will, unless otherwise indicated, refer to the DRB opinion that recommended disbarment.

371. Respondent did not merely hold the interests as investments, but actively participated in the business operations to an extent exceeding that needed to protect his proprietary interest. *Id.* at 372. This extensive participation, including involvement in securing the liquor licenses themselves, sought to assure commercial success of the ventures. We acknowledged that the term "gainful pursuit" had not been defined or applied uniformly. *See id.* Nevertheless, we determined that respondent's conduct violated the constitutional proscription against judges engaging in a "gainful pursuit," as prohibited by Article VI, section VI, paragraph 6 of the New Jersey Constitution. *Id.* at 372–73. We made no determination that judges of the Superior Court are prohibited from holding an interest in a liquor license by virtue of *N.J.S.A.* 2A:154–1 and *N.J.A.C.* 13:2–23.31.

The Court was most perturbed by the failure of respondent to disclose his interests in the liquor licenses and his conscious efforts to conceal his ownership interests. *In re Yaccarino, supra,* 101 *N.J.* at 366, 370. The DRB noted that a lawyer must obey the law, not circumvent it, referring to Disciplinary Rule 1–102(A)(6). It further pointed out that Disciplinary Rule 1–102(A)(4) prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation. *See DR* 7–102(A)(3). As noted by the DRB, "the disciplinary rules require honesty and forthrightness." Thus, as stressed by the DRB, respondent "was the true owner of an interest in the real estate and owned a beneficial interest in the stock of the corporations involved in the liquor businesses;" nevertheless, he "affirmatively attempted to hide his interest by (a) not including his name in the deeds and mortgages, (b) not recording in one of the two ventures a deed between him and his wife that reflected his ownership interest, and (c) by not including his name in the applications for the liquor licenses." His conduct had stains of "misrepresentation and deceit."

The DRB concluded that respondent's failure to disclose his interest offended the Disciplinary Rules. We concur. We find

that this failure violated our Disciplinary Rules 1–102(A)(4) and 7–102(A)(3).

## III.

The other major episode of misconduct involves the *Manzo* matter. The DRB agreed unanimously that this matter implicated conduct touching directly on the administration of justice and the integrity of the judicial process.

Respondent presided as a trial judge, sitting without a jury, in a case that involved dissolution of several closely held corporations, the total corporate assets of which were estimated in the range of $20,000,000 to $30,000,000. These assets were to be distributed to three brothers of the Manzo family, who were the principals of the corporations. One of these assets was a large house situated on three lots located on Philadelphia Boulevard in Sea Girt, New Jersey. In July 1976, the Manzo brothers arrived at a settlement, the terms of which were placed on the record in open court and incorporated in a judgment signed by respondent. The settlement agreement provided for the physical division of certain assets among the brothers; Michael was to receive 60%, Joseph 25% and Patrick 15% of the aggregate value of all the assets, including the Sea Girt property.

Serious disputes arose concerning the interpretation and implementation of the settlement agreement. These gave rise to acts of misconduct by respondent that became the subject of the most serious charges brought against him as a judge and as an attorney.

## A.

As a consequence of the Manzos' inability to resolve their differences, it was agreed by the parties and their respective attorneys that respondent could meet *ex parte* with the individual litigants without their attorneys being present to discuss the case. Such *ex parte* meetings occurred with the Manzo

brothers, individually or severally, with or without their attorneys; there were also several private telephone conversations between respondent and Joseph Manzo.

We need only reiterate our conclusion in the prior proceeding:

Based upon our independent assessment of the record, we determine that the evidence establishes beyond a reasonable doubt that respondent's agreement to conduct these judicial proceedings by meeting the parties *ex parte*, in chambers, off the record, and without their attorneys present was highly improper and contrary to the Rules of Court. In the absence of highly unusual, emergent circumstances, such *ex parte* communications are impermissible. *R.* 1:2–1. By engaging in extended *ex parte* communications with the individual litigants, respondent failed to conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Respondent placed the litigants in a position in which they could believe that they were able to influence the decisions of matters pending before him. Moreover, respondent's *ex parte* communications cannot be considered simply as "technical" violations on the basis that the litigants and their attorneys consented to the procedure. As a member of the judiciary of this state, respondent had an independent and affirmative duty to adhere to those procedural strictures that support the integrity and independence of the judicial system. This conduct violated not only Canon 3A(4), but also the letter and spirit of Canons 1, 2A and 2B, as well as the mandate of Rule 1:2–1 that all trials, hearings on motions, and other applications be conducted in open court. [101 *N.J.* at 385.]

We are satisfied that these acts of misconduct relate primarily, if not exclusively, to respondent's capacity as a judge and only tangentially to his fitness to practice law. However, they are relevant in the context of additional acts of misconduct in the *Manzo* matter that do bear critically on respondent's professional fitness.

B.

The more serious charges involving the *Manzo* matter relate to respondent's conduct in connection with the Sea Girt property. We concluded in the removal case that respondent developed a personal interest in, and improperly attempted to buy, the Sea Girt property. 101 *N.J.* at 385–86. Respondent's conduct generated an absolute and impermissible conflict of interest and the appearance that he exploited his judicial position to obtain the Sea Girt property. Further, respondent also tried to influence expert witnesses, who had already been

retained, to provide favorable opinion evidence in the proceedings and so aid his attempt to obtain the Sea Girt property. To benefit himself in personal, financial, or business dealings, respondent thus compromised his fairness, objectivity, and impartiality. *Id.* at 386.

With respect to this matter, this Court determined the following facts to have been established beyond a reasonable doubt:

(1) The judgment provided that the Manzos were to agree within fifteen days on the valuation of each of the assets, and, in the event they could not agree on the value of any of the assets, the court would appoint an appraiser or appraisers to value any disputed asset that would be binding on all parties.

(2) A disagreement arose with respect the valuation of the Sea Girt property, which Joseph and Patrick Manzo had selected as part of their share of the corporate assets being distributed under the settlement agreement.

(3) Respondent developed a personal interest in acquiring the Sea Girt property, which he expressed in a meeting with Joseph and Patrick Manzo in his chambers sometime in February or March of 1981.

(4) Respondent then embarked on a course of conduct to acquire the property for himself. First, respondent or his wife expressed to others that the cost of the house would be between $110,000 and $120,000, although the fair market value of the property, according to an initial appraisal, was $165,952 (the land at $97,500 and the improvements thereon at $68,452). Respondent then told Richard Smith, a building contractor, that he was interested in purchasing the house and that the sellers were asking "between $60,000 and $80,000. He sought to use Smith in his scheme to acquire the house by (a) having Smith inspect the property and arrange for plumbers and electricians to inspect the house to determine the extent of the damage and the cost of repairs; (b) asking Smith "to take the house in [Smith's] name and when the case was disposed of, then the house would go back to—[respondent];" and (c) requesting Smith to he get in touch and meet with Joseph Manzo to "find out if we could get this thing worked out," so that Smith could take title to the property and transfer title to respondent.

(5) Respondent also attempted to falsify the appraisal of the property to obtain it at a favorable price. In this connection, he did the following things: (a) respondent and Joseph Manzo agreed to have the property reappraised by John Lazarus, the original appraiser; Lazarus, who had originally appraised the property in 1977 at $165,952, was to evaluate it in the $60,000 price range; (b) Joseph Manzo then telephoned Lazarus and told him that they were "trying to figure a way to sell, you know, to sell the house to [respondent]" and that respondent "wanted [Lazarus] to reappraise it at a lower figure;" and that respondent "wants to come in around 60;" (c) respondent also personally spoke to Lazarus about "another appraisal of the property;" (d) Lazarus reappraised the property as of July 10, 1981, copies of which he sent to respondent and Joseph Manzo around August 19, 1981; the appraisal valued the land at

$100,000, $2,500 more than he evaluated it at in the 1977 appraisal, but evaluated the improvements thereon at $33,448 as compared to the $68,452 value of four years earlier, which, according to Lazarus, was "as low as I could support it."

Respondent thereafter indicated he was no longer interested in the property.

With respect to this aspect of the *Manzo* matter, the DRB found that respondent's personal interest in gaining financial advantage prevailed over his duty to the justice system and that he used his public office to self-deal. It determined that respondent "flagrantly offended the standards of conduct fixed in *DR* 8–101(A)(1) and *DR* 1–102(A)(5) & (6)." We concur.

## C.

There was a final aspect of the *Manzo* matter, with respect to which we determined these additional facts beyond a reasonable doubt:

(1) After respondent had first expressed an interest in acquiring the Sea Girt property, Joseph Manzo recorded a number of telephone conversations between himself and respondent and between himself and others, including Lazarus. Manzo's purpose in recording the conversations was to obtain documented evidence that he would use to force respondent to disqualify himself from hearing the *Manzo* case.

(2) In February of 1982, John R. Fiorino, a real-estate broker, contacted Michael Manzo to inquire whether the Sea Girt property was available for sale. Later, Fiorino contacted Joseph Manzo and met with him to discuss the Sea Girt property. Joseph Manzo told Fiorino that they [the Manzos] were seeking approximately $200,000 for the property; however, he also stated that he really could not sell Fiorino the house because respondent wanted it.

(3) Joseph Manzo also informed Fiorino that he possessed tape-recorded conversations wherein respondent had expressed his personal interest in the Sea Girt property; thereafter: (a) Joseph Manzo returned to Fiorino's office on the next day and played portions of these tapes; (b) after hearing the tapes, Fiorino sought and obtained legal advice from John Bonello, Esq., who contacted Theodore Geiser, Esq., a member of the defense team representing respondent in connection with other complaints then pending against respondent before the Advisory Committee on Judicial Conduct; (c) Fiorino later related to Geiser what he had been told by Joseph Manzo and gave Geiser a synopsis of what was on the tapes, which were delivered to Geiser's office and, on Saturday, February 20, 1982, John B. Murray, Esq., a partner in Geiser's law firm advised Geiser that he had listened to the tape.

(4) Geiser then called respondent and informed him for the first time of the existence of the Manzo tapes; respondent stated to Geiser: "[p]lease don't tell anyone about those tapes for the time being."

(5) On March 3, 1982, respondent, in a meeting with Michael D. Schottland, Esq., and Charles J. Uliano, Esq., who was also a member of his defense team, stated that the litigants in the Manzo case should be ordered into court and questioned on the record about the tapes and directed to turn the tapes over to the court. Respondent was advised not to do this.

(6) The following afternoon, Saturday, March 6, 1982, the tapes were played by Schottland, Uliano, and Geiser, in the presence of several other attorneys, George Chamlin, Thomas W. Cavanagh, Jr., Joseph Dempsey, and Charles A. Costanzo. Respondent and John Bonello later joined this group and Geiser disclosed the contents of the tapes to respondent. Geiser then suggested that respondent seek retirement based on medical disability and that he not return to the bench. Respondent rejected this advice, and Geiser then withdrew as one of respondent's attorneys. Cavanagh, one of the attorneys present, expressed the opinion that respondent was obliged to report the matter to the Supreme Court immediately and that if he did not, the attorneys might themselves have an obligation to do so; respondent became irate and told Cavanagh to leave, which he did. Respondent left shortly thereafter.

(7) Later that evening respondent told Richard Bonello that the Manzo tapes had to be destroyed; he also told Bonello that an affidavit had to be obtained from Joseph Manzo stating that the tapes never existed. The next morning on March 7, 1982, respondent called Bonello and told him that Joseph Manzo should destroy the tapes and then state in open court that they had existed but contained nothing relevant.

The matter became the subject of official action after Geiser, on the evening of March 7, informed the Advisory Committee on Judicial Conduct of the existence of these tapes. On the following day, March 8, 1982, Richard Bonello delivered the original and a copy of the tape to the State Police.

Based on these facts, we concluded in the judicial-removal proceedings that the evidence established beyond a reasonable doubt that respondent violated several judicial ethics strictures, namely, Canon 1, 2 A, 2 B, 3 A(4), 3 C, 3 D, 5 C(1) and 5 C(7), and that respondent's conduct impugned the integrity and independence of the judiciary and created the appearance of impropriety.

This was our conclusion:

Based upon a resolution of close credibility issues, we have determined further in the *Manzo* matter that respondent became aware of the existence of objective evidence of self-dealing that would tend to incriminate him, at least in

terms of potential disciplinary charges. This evidence consisted of the taped recordings of his conversations in which he sought to obtain the Sea Girt property. He had a duty immediately to unburden the judiciary of this conflict. He chose a path designed to suppress and conceal this evidence. We find beyond a reasonable doubt that respondent's conduct in this regard demonstrates a disrespect for the law, a lack of integrity, and a failure to observe the high standards of conduct required of a judge in order to promote public confidence in the judiciary. [101 *N.J.* at 392.]

The DRB concluded that this aspect of the *Manzo* matter demonstrated that respondent was guilty of Disciplinary Rule violations. It observed that when respondent became aware of the existence of certain tape recordings of conversations about the Sea Girt property, rather than openly confront the evidence that tended to incriminate him, respondent chose a path designed to suppress and conceal this evidence. It emphasized that respondent requested that the tapes be destroyed, that an affidavit be secured from the litigant who taped the conversations stating that the tapes never existed, and that respondent later urged that this litigant should destroy the tapes and state in open court that they had existed, but contained nothing relevant. This course of action, according to the DRB, demonstrated contempt for the legal system, a lack of integrity, and the gross failure to observe the high standards of conduct required of judge and attorney alike, offending the standards of conduct reflected in Disciplinary Rules 1–102(A)(4), (5) and (6).

We agree with this assessment. Respondent's ethics breaches in the *Manzo* matter warrant severe professional discipline, subject to our consideration of mitigation evidence and defenses.

## IV.

██ In the prior proceedings, respondent claimed that his medical condition constituted a mitigating circumstance sufficient to excuse his unethical conduct. He renews the argument in this case.

The gravamen of respondent's medical defense is that respondent suffered organic brain damage or dysfunction as a result

of coronary bypass surgery in February of 1979. He asserted his conduct "was neither willful nor negligent, but constituted and [was] directly attributable to the direct and unanticipated consequences of severe and radical surgical trauma coupled with serious physical and/or emotional ailments which involuntarily disabled and prevented him from properly performing his judicial duties." 101 *N.J.* at 392.

We carefully assessed the medical evidence offered to substantiate respondent's position. We determined that the evidence demonstrated a disability, and, in fact, supported respondent's application for retirement under *N.J.S.A.* 43:6A–12. Nevertheless, we were satisfied that even assuming that respondent sustained some organic brain damage and some personality change or dysfunction secondary to his cardiac surgery, this medical evidence did not directly relate to motive or volition or affect the quality of respondent's conduct. Hence, we concluded, respondent's medical condition did not mitigate or constitute a defense to his unethical conduct in the removal proceedings. *See In re Yaccarino, supra,* 101 *N.J.* at 392–95.

In this case, the OAE contended that the Court's prior determination that respondent acted knowingly and voluntarily is conclusive on the issue of respondent's intent and the issue of medical mitigation. We disagree. The DRB correctly ruled that our determination in the removal proceedings concerning respondent's medical condition as it relates to mitigation or defenses is not conclusive in this case. Respondent presented new evidence that should be weighed and considered together with other evidence previously submitted that may appear in a different light.

Respondent presented Dr. Thomas Westerman, who was a witness for respondent in the removal proceedings. He testified about respondent's perceptual problems and impaired judgment dating from the time of the bypass surgery. *In re Yaccarino, supra,* 101 *N.J.* at 392–95. In addition, the respon-

dent offered the testimony of Dr. James J. McMahon, a psychologist.

Dr. McMahon expressed the opinion that respondent sustained brain damage during surgery that caused his neurological intelligence to temporarily decline and, during the time he engaged in ethical misconduct, he functioned at a reduced level of intelligence. Dr. McMahon believed that this diminished intellectual force effectively disabled respondent from coping with the day-to-day problems and temptations that a person of undiminished neurological intellect could resist and defeat.

Dr. McMahon classified respondent's medical condition as "perseveration," which is attributed to the physical effects of the surgery. It is characterized by the illogical repetition of the same conduct after the causative stimulus has been removed. Dr. McMahon concluded that while a rational person would stop breaching those rules by which his actions should be governed, respondent unreasonably persisted. He found such persistence in respondent's reaction to his daughter's arrest, his investment in the liquor enterprises, and the financial interest he tried to acquire in the *Manzo* settlement. Dr. McMahon believed respondent would not have acted the way he did if his intellect had not diminished. He also believed that respondent during this time did not know the difference between right and wrong. He further stated that respondent's impairment was attributable to a temporary medical condition that was followed by a rise in his intelligence and pre-surgery levels of functioning.

The DRB unanimously agreed that Dr. McMahon's opinion should be weighed in assessing the appropriate discipline. Four members of the DRB, nonetheless, found it to be deficient and ultimately unpersuasive.

We conclude that this medical evidence, in conjunction with all of the evidence presented with respect to respondent's medical condition, does not serve to mitigate the gravity of respondent's ethics breaches. Respondent, it must be empha-

sized, functioned well and efficiently with respect to his regular judicial responsibilities during the many months he served on the bench after his surgery. There is no suggestion that in most of the matters in which he presided he had any difficulty, ambivalence or confusion concerning his judicial duties, the proper ethical course to follow, the appropriate appearances to preserve, or the difference between right and wrong. As the DRB observed, respondent's disability "did not cause him to lose his sense of ethics." Moreover, despite Dr. McMahon's diagnosis or theory of "perseveration," in none of the episodes did respondent persist in the offending behavior, even after the "stimulus" ceased; rather his misbehavior coincided with a particular motivation to achieve a particular personal objective and desisted only after that objective was achieved or foreclosed.

While Dr. McMahon's opinion suggests that respondent was "perceptually impaired" this is not generally evident. He reacted strongly and excessively to his daughter's troubles and, plausibly, he reacted out of aroused emotions that might impair "perceptions." But, one cannot conclude that he did not fully know—and perceive—that he was using his judicial office and authority to bend the will of other officials and that this was wrong and unethical. This episode ended with the termination of the municipal court proceedings.

Similarly his conduct in securing an ownership or beneficial interest in liquor licenses, as well as his attempt to acquire the valuable Sea Girt property in the *Manzo* matter, is characterized by knowledge, awareness, and cleverness, and not by clouded thinking or irresistible feelings. These acts constituted, as noted, serious breaches of ethics. But we find no basis for concluding that they were undertaken because respondent's perceptions, his ability to see things realistically and correctly, were impaired. If, as expressed in the doctor's report, respondent was "perceptually impaired" after his surgery, Dr. McMahon's opinion, as the DRB observed, "does not translate, how-

ever, into a finding that respondent did not know what he was doing."

We also reject any claim by respondent that his misconduct should be excused because of an involuntary lack of control over his own acts. Dr. McMahon believed that respondent's "appropriate moral, legal, and common sense responses ... had long since been eroded." However, the DRB rejected this because "the proofs were simply insufficient." The Board also discounted as a "net opinion," Dr. McMahon's statement that respondent was "out of control. He did not know the difference between right and wrong." There was no support for this opinion and it was not proffered as a medical opinion or expressed in terms of a reasonable medical certainty.

Indeed, in each of the distinct episodes of ethical misconduct respondent appears to have known that what he was doing was unethical and improper, and that he could have refrained or desisted from doing what he did. For example, as we view the record, respondent, with intellectual acumen and persistence, went about securing a beneficial interest in liquor licenses. In the *Manzo* matter, he carefully contrived a deceitful scheme to acquire the Sea Girt property for himself. He proceeded systematically, step-by-step, to make sure the principals would agree, to find a "straw man" to take title, and to secure a false appraisal to support the purchase price. Further, there is no suggestion that he abandoned the scheme out of a sense of remorse or guilt or from a resurgence of will power. Indeed, such inferences are effectively negated by his subsequent methodical efforts to destroy the evidence of his wrongdoing. This pattern of behavior simply does not support the psychologist's explanation of lack of resistance or "perseveration in the face of temptation."

In assessing expert psychiatric or psychological opinion testimony, the Court, as fact-finder, is enjoined to use its common sense and ordinary experience. *See In re CAH and BAR,* 89 *N.J.* 326 (1982). Here, Dr. McMahon's expert opinion and the

evidence offered by other medical witnesses were simply insufficient to demonstrate on respondent's part a lack of moral awareness, a lack of purpose, and a lack of volition.

## V.

We proceed to the issue of appropriate discipline. The attorney-disciplinary system is designed to preserve public confidence in the legal system. *In re Spitalnick*, 63 *N.J.* 429, 431–32 (1973). The goal of disciplinary proceedings is not to punish, but to protect the interests of the public and the bar, mindful of the concerns of the individual involved. *In re Infinito*, 94 *N.J.* 50, 57 (1983); *In re Mischlich*, 60 *N.J.* 590, 593 (1972); *In re Pennica*, 36 *N.J.* 401, 418–19 (1962).

We have recognized that "certain types of ethical violations are, by their very nature, so patently offensive to the elementary standards of a lawyer's professional duty that they *per se* warrant disbarment." *Matter of Conway, supra,* 107 *N.J.* at 180. There are certain acts by attorneys that so impugn the integrity of the legal system that disbarment is the only appropriate remedy. *In re Hughes*, 90 *N.J.* 32, 37 (1982); *In re Wilson*, 81 *N.J.* 451 (1979). These include, for example, any attempt to corrupt the judicial process by an attorney suborning perjury or tampering with witnesses to fix a case, *Matter of Conway, supra,* or assisting others in such efforts, *Matter of Rigolosi*, 107 *N.J.* 192 (1987), or bribing a police officer, *see In re Hyett*, 61 *N.J.* 518 (1972), or the bribery of a public official, *see In re Tuso*, 104 *N.J.* 59 (1986); *In re Hughes, supra,* 90 *N.J.* 32, or by a judge accepting a bribe and not sentencing a defendant according to the law, *see Matter of Coruzzi, supra,* 98 *N.J.* 77. "Misconduct of this stripe conclusively renders the wrongdoer unworthy of the profession." *Matter of Conway, supra,* 107 *N.J.* at 182.

The Court has consistently subjected attorneys who commit acts of serious misconduct while serving in public office to stringent discipline, normally disbarment. *See, e.g., In re*

*Coruzzi, supra,* 98 *N.J.* 77. Therefore, it is appropriate to discipline an attorney for conduct as a judge if the conduct itself corrupts the judicial process or evidences a lack of the character and integrity that are necessary in an attorney. Conduct by a judge may require disbarment if that conduct demonstrates such untrustworthiness, dishonesty or lack of integrity that the public must be protected from such a person as a lawyer.

We turn to the record here to consider appropriate discipline in light of these standards. With respect to the Stockton College matter respondent's misconduct, as noted, bears most materially on his status as a judge. He attempted to use his public office to influence the disposition of pending charges against his daughter and to deter other public officials from performing their lawful duties. He misused his office to secure a personal advantage. The misuse of judicial office to enhance personal, private or individual professional interests reflects adversely on a person's capacity as a judge and as a lawyer. *See In re Vasser, supra,* 75 *N.J.* 357. It is necessary in the public interest, therefore, that discipline be addressed to both capacities. The integrity of the judiciary and of the practicing bar must be protected through suitable discipline. Consequently, we conclude that any judicial sanction imposed on respondent from this episode does not automatically satisfy the needs to be served by professional discipline.

With respect to the ABC matters, we concluded in the judicial-removal proceedings that the judicial stricture against gainful pursuit was not that obvious or clear enough to warrant additional judicial sanctions. We concluded, nonetheless, that it imposes a standard to which judges must adhere. *In re Yaccarino, supra,* 101 *N.J.* at 372–73. The breach of this standard in the context of this case does not bear significantly on respondent's fitness to practice law. We accordingly do not address the need for any separate professional discipline based on this aspect of respondent's misconduct.

The transgressions involving respondent's hidden interest in the liquor licenses, however, cannot be similarly regarded. As noted, the applicable statutes concerning investment in such licenses compel disclosure, *see N.J.S.A.* 33:1-25 and 33:1-26. Respondent owed a duty to comply with those statutory provisions and not evade them by improperly withholding or concealing information. *See In re DelSordo,* 96 *N.J.* 133, 140-41 (1984). Respondent's attempts to conceal his interests is tantamount to actual misrepresentation. *In re Ryan,* 66 *N.J.* 147, 150 (1974). This is inconsistent with the professional obligations of an attorney, who "should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice." *In re Howell,* 10 *N.J.* 139, 140 (1952).

In the *Manzo* matter, respondent's misdeeds directly affected the administration of justice.

As noted earlier, he engaged in highly improper conduct by dealing with parties on an *ex parte* basis. We are satisfied that this misconduct primarily implicates respondent's status as a judge and not as a lawyer. Indeed, there are cases involving judicial discipline in which the misconduct may not implicate a person's capacity or status as a lawyer or reflect adversely on professional fitness as a member of the bar. *See, e.g., In re Alvino,* 100 *N.J.* 92 (1985); *In re Sadofski,* 98 *N.J.* 434 (1985); *In re Albano,* 75 *N.J.* 509 (1978). Such cases can involve acts of misconduct that relate exclusively or primarily to the discharge of judicial duties. They may entail errors in judgment, inappropriate displays of temperament, or lapses in adherence to necessary procedures, which reflect only or primarily on the person's qualifications as a judge. Respondent's misconduct in conducting *ex parte* meetings with litigants in this case, however, did bear on his professional fitness, because it framed his other, more serious misdeeds. Due to the gravity of the ensuing ethics breaches in the *Manzo* matter, however, this misconduct need not be considered independently as a basis for professional discipline.

Respondent conspired with others to acquire property belonging to litigants; he suborned perjury in attempting to arrange for a transfer of title to a third person that would have been part of a court-approved settlement; and he engaged in the falsification of evidence for use in court proceedings. In addition, he tried to conceal evidence of his own professional misconduct. When faced with incriminating evidence, he advocated its destruction and the subornation of perjury. In the course of this conduct, respondent betrayed, subverted, and corrupted the system he swore to serve. *See In re Rosen*, 88 *N.J.* 1, 2 (1981); *In re La Duca*, 62 *N.J.* 133, 140 (1973); *In re Foster*, 60 *N.J.* 134, 136 (1972).

 Judicial misconduct that involves overreaching and misuse of judicial office for personal advantage can adversely reflect on and affect the individual's fitness to practice of law. *See, e.g., In re Vasser, supra,* 75 *N.J.* 357; *In re Hardt,* 72 *N.J.* 160 (1977). Acts of dishonesty, venality or greed will clearly implicate professional fitness. *See, e.g., In re Coruzzi, supra,* 98 *N.J.* 77. Furthermore, acts that undermine the integrity of the administration of justice are destructive of the legal profession itself, and reflect adversely on professional as well as judicial fitness. *Id.*

The DRB reached the following conclusion, with which we agree:

> Respondent manifested a disrespect for the law and discredited the profession. Absent mitigation or excuse, his conduct reflects an utter lack of integrity; it further reflects adversely on his fitness to practice law. *See In re Lemken,* 75 *N.J.* 98, 100 (1977); *see generally Application of Matthews,* 94 *N.J.* 59, 77 (1983); *DR* 1–102(A)(6). The duty to uphold and obey the law persists even when the attorney wishes to be a business man or investor: he must display in his business transactions the highest standards of ethical and moral uprightness. Should he fail to maintain these standards, he should be disciplined. *See In re Carlsen,* 17 *N.J.* 338, 346–49 (1955); *Marco v. Dulles,* 169 *F.Supp.* 622, 631 (S.D.N.Y.1959), quoted in *In re Ryan, supra,* 66 *N.J.* at 151.

In the case of *Matter of Verdiramo*, 96 *N.J.* 183 (1984), the Court determined that the crime of attempting to influence the testimony of a federal grand jury witness constituted "grave

misconduct that goes to the heart of the administration of justice." *Id.* at 185. We said:

> Professional misconduct that takes deadly aim at the public-at-large is as grave as the misconduct that victimizes a lawyer's individual clients. Because such a transgression directly subverts and corrupts the administration of justice, it must be ranked among the most egregious of ethical violations. [*Id.* at 186.]

In *Matter of Edson*, this Court ordered disbarment of an attorney who counseled his client to fabricate evidence in order to satisfy a defense to a legal action. 108 *N.J.* 464 (1987). The Court found that members of the bar

> must possess a certain set of traits—honesty and truthfulness, trustworthiness and reliability, and a professional commitment to the judicial process and the administration of justice. These personal characteristics are required to ensure that lawyers will serve both their clients and the administration of justice honorably and responsibly. [*Id.* at 473 (*quoting Application of Matthews*, 94 *N.J.* 59, 77 (1983)).]

*See Matter of Rigolosi, supra,* 107 *N.J.* at 192.

We observed in *Matter of Conway, supra,* 107 *N.J.* at 182 that:

> [t]he subversion of the criminal justice system which took place in this case is comparable to the betrayal of justice that occurs when a judge accepts a bribe and does not sentence a defendant according to law, *see Matter of Coruzzi, supra,* 98 *N.J.* 77, or when a lawyer bribes a public official to prevent the performance of a public duty. *See Matter of Tuso,* 104 *N.J.* 59 (1986); *Matter of Hughes, supra,* 90 *N.J.* 32.

"[T]his kind of ethics violation—the purposeful, knowing and corrupt subversion of a criminal prosecution [is] *per se* evidence of professional unfitness. An attorney who engaged in such conduct can never be trusted with the responsibilities of being a lawyer." *Id.* at 182–83.

The public is entitled to protection not only from attorneys who act unethically in their professional practices, but also from those whose conduct in public office impugns their fitness to practice law. *In re Gross,* 85 *N.J.* 26 (1980); *In re Gordon,* 58 *N.J.* 386 (1971). Unethical acts of this kind—the knowing subversion of the justice system—poison the well of justice and render the wrongdoer unworthy of the profession. *In re Rigolosi, supra,* 107 *N.J.* at 207–10 (1987). "[S]ociety is enti-

tled to know, by the discipline imposed, that the offending party, as well as other attorneys, will be effectively prevented from contemplating or embarking upon a similar dishonorable course. Protection of the public demands disbarment." *In re Conway, supra,* 107 *N.J.* at 183.

Our dissenting colleagues, as well as four members of the DRB, are of the view that only slight additional discipline for respondent is appropriate. Mitigating factors relevant to respondent's situation are said to be his overall performance over his legal career as a prosecutor and judge, the remoteness of the critical events, the lack of extreme gravity suggested by the absence of criminal prosecution, the recommendations of only a public reprimand and the limited reduction of respondent's pension in the wake of these events. Other mitigating factors are derived from respondent's medical condition and his attitude of remorse and candor in confronting the disciplinary charges. *Post* at 207 (incorporating opinion of DRB members recommending public reprimand).

We cannot give weight to these factors sufficient to overcome the enormity of respondent's misconduct. We repeat what we said in *Matter of Coruzzi, supra,* 98 *N.J.* at 81: Misconduct that subverts the judicial process "must evoke particular consternation when committed by a sitting judge, for then it strikes directly at the heart of the administration of justice. . . . Surely a public official's years of public service cannot serve to mitigate the sanction when . . . his misconduct is in direct disregard of the public trust." Respondent's misconduct in the *Manzo* matter, including his attempt to acquire the property of litigants, to corrupt witnesses, and to destroy evidence of that wrongdoing clearly warrants disbarment.

## VI.

We conclude based on determinations of fact established beyond a reasonable doubt that respondent must be disbarred.

He shall reimburse the Ethics Finance Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

O'HERN and GARIBALDI, JJ., dissenting.

We dissent from the disposition of the Court primarily on the basis of the Mitigating Circumstances set forth in Part IV of the non-disbarment opinion of the equally-divided Disciplinary Review Board. Those mitigating circumstances (with a few sentences deleted) are published herewith. We add only these observations.

We often reiterate that protection of the public, not punishment of the attorney, is the purpose of attorney discipline. *In re Goldstein,* 97 *N.J.* 545, 548 (1984). As a recipient of a judicial pension, respondent can never represent a client in a New Jersey court. *N.J.S.A.* 43:6A–13(a). He may never file or add his name to a brief or pleading in a New Jersey court, nor may he ever represent a New Jersey public body, except in a limited advisory capacity. *Schwartz v. Judicial Retirement System of N.J.,* 584 *F.Supp.* 711 (D.N.J.1984). He may counsel clients and he may represent clients in a federal court, but realistically that is unlikely since almost his entire life has been spent in a State courtroom.

The majority says that we favor but slight discipline for the ethical infractions. *Ante* at 202. For respondent, although he might protest otherwise, removal from judicial office is undoubtedly the greatest punishment—the tragic end of a promising career. Had he been convicted of public corruption, he would of course be subject to disbarment and forfeiture of pension. *In re Coruzzi,* 98 *N.J.* 77 (1984). Had he been found to have destroyed or conspired to destroy evidence of criminal conduct, he would have been subject to criminal action. But the State's Attorney General found that there was not probable cause to believe that a crime had been committed. Respondent may have sought to withhold evidence that disclosed a breach

of the Code of Judicial Conduct, but not evidence of a crime. *See N.J.S.A.* 2C:29–3a(3). Our removal decision fell short of convicting respondent of criminal conduct, concluding rather that

> [b]ased upon a resolution of close credibility issues, we have determined further in the *Manzo* matter that respondent became aware of the existence of objective evidence of self-dealing that would tend to incriminate him, at least in terms of potential disciplinary charges. This evidence consisted of the taped recordings of his conversations in which he sought to obtain the Sea Girt property. He had a duty immediately to unburden the judiciary of this conflict. He chose a path designed to suppress and conceal this evidence. We find beyond a reasonable doubt that respondent's conduct in this regard demonstrates a disrespect for the law, a lack of integrity, and a failure to observe the high standards of conduct *required of a judge in order to promote public confidence in the judiciary.* [*In re Yaccarino,* 101 *N.J.* 342, 392 (1985) (emphasis added).]

Respondent has been removed from office, not convicted of crime. Public confidence in the judiciary has been achieved. No further public interest is served by disbarring a retired judge who is no longer active at the bar.

## PART IV OF THE OPINION OF FOUR MEMBERS OF THE DISCIPLINARY REVIEW BOARD VOTING NOT TO DISBAR

### IV. THE MITIGATING CIRCUMSTANCES

We will now assume, *arguendo*, that the medical testimony should be discredited. We further assume that, even if credited, it is not sufficient *ipso facto* to forestall disbarment. Notwithstanding this assumption, and even accepting for the moment that respondent was fully cognizant of and responsible for his conduct, we nevertheless would not disbar for independent reasons. We do not reach this conclusion inexorably. We do not say it is a conclusion which obtains with syllogistic precision. We do not gainsay the fact that it is born of instinct and inclination. We do say that an application of all the circumstances, that a global view of all the mitigating factors,

militates against disbarment. If there is one word which encapsulates all of these elements, it is simply this: fairness.

Turning to those circumstances, they are, *inter alia:*

1. First, there is his overall performance. The Court has stated:

> ... We are mindful that respondent over the course of his judicial career has been assigned significant and substantial judicial responsibilities and has been a productive, conscientious, and energetic judge. Many attorneys have commended respondent's performance in office ... [*Matter of Yaccarino,* 101 *N.J.* at 388]

Again:

> ... In fairness we must also consider the totality of respondent's judicial career. We are aware of the many years of service that respondent has given to the public as prosecutor and judge. That record is not only essentially blameless, but reflects dedication and skill, and official recognition in terms of the duties and responsibilities to which respondent has been assigned. Moreover, many judges and lawyers who have known respondent have sensed a profound change in him following the open-heart surgery. Significantly, some of the most damaging testimony against respondent was prefaced by expressions of personal concern for the respondent. And, as noted, there is evidence of current medical impairment.

> It is always difficult to balance a lifetime of service against a congeries of transgressions.... at 396. [*Matter of Yaccarino,* 101 *N.J.* at 396]

2. Although respondent's medical problem may or may not be a *per se* condition exculpating him, it is at least a factor to be considered. Respondent, to some degree at least, was unquestionably debilitated. Even the Office of Attorney Ethics acknowledged that "these various medical ailments could constitute mitigating circumstances in a disciplinary proceeding ..." (See Memorandum of the OAE to the DRB of April 4, 1988, at p. 7.) As the District Ethics Committee stated in its decision, "the issue presented to the committee through expert witnesses was whether or not the respondent in fact had medical conditions which should constitute mitigating circumstances."

3. This is not a *Wilson* case where a client's funds have been misappropriated, requiring automatic disbarment. And it is not a corruption case, not a disgrace of the *Corruzzi–DeVita* genre. It is, instead, an administration of justice matter. To be sure, administration of justice matters are serious, as this

matter is serious. Nonetheless, the Damoclean sword should not fall automatically in such cases. The Court has not consistently imposed disbarment and, quantitatively, disbarment may even be the exception, rather than the rule.

4. We are now approaching the tenth anniversary of the genesis of this matter. Most of respondent's problems can be placed at his doorstep. But not a delay of a decade. Decency and due process deplore such a protracted proceeding particularly if it were to end in the ultimate penalty. The Court has "taken into account the extended delay in the imposition of attorney discipline." *In re Hecker*, 109 *N.J.* 539 (1988) (where, *inter alia*, "almost ten years have passed since the entry of the civil verdict," at 553); *In re Stier*, 108 *N.J.* 455 (1987); *In re Kotok*, 108 *N.J.* 314 (1987). "We have attempted to clear from our system of attorney discipline cases such as this that, because of complex factual and legal background, were delayed in their resolution for years on end." *In re Hecker, supra*, 109 *N.J.* at 553.

5. The Attorney General and the Division of Criminal Justice determined that criminal action should not be instituted against respondent.

6. The State House Commission concluded that the extent of respondent's conduct justified only a seven and one-half percent reduction in his pension. If his conduct had assumed the monstrous proportions suggested by the OAE and the disbarment opinion, surely the State House Commission would have (and should have) denied him that pension. The views of another branch of government, reviewing the same transgressions in a different context, are entitled to weight in these proceedings as well.

7. Most critically, the District Ethics Panel, composed of highly respected, independent and experienced attorneys from a foreign county, who had the opportunity to hear respondent and the physicians, held that a public reprimand satisfied justice. That should mean something, particularly in light of the fact

that the Committee also believed he should have been removed from the bench.

8. The District Committee found that he has been "conducting a limited practice of law since his removal." He has not sought out any associations with law firms because "I didn't want to cause anybody an embarrassment." (Tr. 173; 6-3-87). He does not maintain an office in the traditional sense. Whether this is a *de facto* suspension, as argued by respondent's counsel, is irrelevant. It has been an inactive practice.

9. The District Committee found, as did we, that respondent was remorseful.

10. The District Committee also determined that the respondent voluntarily sought out medical attention, including psychological counselling. Apposite here are the remarks of the Court in *Matter of Templeton*, 99 *N.J.* 365, 373 (1985):

> In all disciplinary cases, we have felt constrained as a matter of fairness to the public, to the charged attorney, and to the justice system, to search diligently for some credible reason other than professional and personal immorality that could serve to explain, and perhaps extenuate, egregious misconduct. We have always permitted a charged attorney to show, if at all possible, that the root of the transgressions is not intractable dishonesty, venality, immorality, or incompetence. We generally acknowledge the possibility that the determinative cause of wrongdoing might be some mental, emotional, or psychological state or medical condition that is not obvious and, if present, could be corrected through treatment. An inquiry into such possible causes of ethical misconduct not only can be instructive and enlightening, it may also hold the promise of a resolution of the disciplinary charges in terms of personal rehabilitation, which will serve to protect the public interest without ruining a lawyer's career and life.

11. The Committee concluded, as did we, that there were no other violations or complaints throughout respondent's long legal and judicial career and that there was "no possible danger to the public."

12. The respondent testified before the District Committee below in a "forthright, open and candid manner." The same is true of his appearance before the DRB.

13. Finally, and most important, we return to the standard of fairness. We agree that judicial removal does not insulate the offender from attorney discipline based on the same miscon-

duct. *See, e.g. Matter of Coruzzi,* 98 *N.J.* 77 (1984). But neither is the converse true—judicial removal does not compel attorney discipline based on the same misconduct. *Ad hoc,* not *per se,* must be the rule. By definition such determinations are *sui generis* and must be so treated for any number of reasons: (1) the guidelines for such problems are few since there have been so blessedly few cases of judicial misconduct in this State; (2) our system of jurisprudence, particularly in ethics cases, militates against such an inflexible approach, *Wilson* being the notable and correct exception to the rule; (3) this is, perhaps, a "different situation," as the then DRB Chairman noted (see pp. 3–4 *supra.*); (4) in its November 6, 1986, order, the Court specifically stated that, on the issue of mitigation, the parties may present additional evidence and arguments; and (5) judges who have labored so long, at such extraordinary sacrifice, deserve not special consideration, but some measure of decency.

That said, there is one primary question, one polestar, to be used in deciding this matter. It is not *res judicata* or which appellate review principles obtain. It is not what the DRB, OAE or District Ethics Committee think. It is not what a doctor thinks. It is not, as noted below, what the public thinks. It is only this: what is fair, right and just to do?

This respondent has already received the ultimate punishment which may be visited upon a judge. He has been removed from his judicial office. He and his family have been subjected to embarrassment and excoriation, public scorn and humiliation, all of the most profound kind. His medical condition, already severe, has worsened. He has suffered and, harsh as it sounds, he deserved to suffer. But he has suffered enough.

We understand full well that the goal of the ethics process is preservation of the public's confidence in our judicial and legal systems. The discussion below does not detract one whit from our regard for the public interest. That is a valid consideration, and the OAE and disbarment opinion make much of that. But it is not an absolute. The public and the public interest,

separate concepts, have been satisfied. They have witnessed the respondent's ignominy. They have seen the decision against him and the ultimate penalty, loss of his judgeship.

Day after day, indeed year after year, his fall from grace and the reasons for it have been reported in the press. Surely the public understands that he has been soundly punished, that he gained nothing and lost everything, that the system has been preserved, that the system does not protect its own, and that it may have confidence in the system. To say that the public needs more, that it wants to see respondent carted away in the trundle anew, is to simultaneously underestimate and overestimate that public. Those who read about these matters understand what happened and have no cause to doubt the objectivity or toughness of the process. Those who do not bother to read or understand do not care and do not know.

\* \* \* \* \* \* \* \*

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK and STEIN—5.

*Dissenting*—Justices O'HERN and GARIBALDI—2.

## ORDER

It is ORDERED that THOMAS YACCARINO of WAYSIDE, who was admitted to the bar of this State in 1961, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that THOMAS YACCARINO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.