**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0078-23

IN THE MATTER OF THE
APPEAL OF THE DENIAL OF AN
APPLICATION FOR A PERMIT
TO CARRY A HANDGUN BY
APPLICANT, R.R.

_____

Submitted March 19, 2025 – Decided August 25, 2025

Before Judges Marczyk and Paganelli.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. GPA-MID-021-2022.

Evan F. Nappen Attorney at Law PC, attorneys for appellant R.R. (Louis P. Nappen, on the briefs).

Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent State of New Jersey (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Petitioner R.R.[1] appeals from the trial court's August 7, 2023 order denying his application for a permit to carry a handgun. Based on our review of the record and the applicable legal principles, we affirm.

I.

We derive the following facts from the hearing and other portions of the record. Petitioner applied for a permit to carry a handgun in August 2022. Detective Jeremy Berry of the Sayreville Police Department (SPD) conducted an investigation regarding petitioner's application. Detective Berry found petitioner had no documented criminal history or mental health issues. Detective Berry contacted petitioner's references, who "returned favorable reviews." Petitioner also provided proof he completed a handgun qualification course. During the course of the investigation, the Sayreville clerk informed Detective Berry about numerous email communications petitioner had sent to Sayreville employees over a two-year span regarding a tax dispute where petitioner believed he overpaid taxes.

Detective Berry ultimately denied petitioner's application to carry a handgun. In the September 29, 2022 letter, the detective stated:

---

[1] We refer to petitioner by initials because of the submission of a psychiatric evaluation in the proceeding. See R. 1:38-3(a)(2).

A-0078-23

My investigation revealed that you have had some concerning correspondences, via email, with employees of [Sayreville]. Specifically, on [September 29, 2022], you sent an email to the [SPD] where you were demanding information and you named each member of the [SPD] Chief's family. I have informed the prosecutors of my finding[s] and WE have decided to **REJECT** your application to carry a firearm[] [under] [N.J.S.A.] 2C:58-3(c), public health, safety and welfare.

Petitioner appealed from the denial of his application, and the trial court conducted a hearing in August 2023. Detective Berry was called as a witness, and the State introduced a series of emails between petitioner and Sayreville employees which Detective Berry relied upon to deny the application.

Detective Berry initially testified regarding petitioner's three municipal court cases. In 2010, petitioner pled guilty to an amended petty disorderly persons offense and fines were imposed. In another matter, petitioner was charged with disobeying the orders of a judge and passive physical restraint of police while they were attempting to make an arrest. Of the two charges, one was dismissed, and one was amended to disorderly conduct for which petitioner was fined.

Detective Berry then testified regarding various emails petitioner sent to the Sayreville clerk referring to the "Blood of Christ" and an affidavit submitted by petitioner to Sayreville regarding "[o]ne's [e]ntire [z]ygote/[p]ellucid

3

[m]embrane as the [s]ingular '[h]istorical & [p]resent, [r]eligious & [s]cientific, [n]ative & [c]ustomary, [t]ruth & [m]atter of [f]act' [p]roving [o]ne's [p]ersonal, [p]rivate, and [c]onfidential [p]roperty/[p]aramount [e]quity '[f]ound' within [o]ne's [o]riginal [b]iological /DNA [b]irthday '[c]ake' a.k.a. [o]ne's '[b]aggage and [e]ffects' a.k.a. [o]ne's [p]lacenta." Detective Berry testified he did not understand what petitioner was discussing, and the communications were "kind of rambling" and had nothing to do with petitioner's tax issues.

Detective Berry further testified regarding: petitioner's referencing credit as a "figment of the imagination," ballot harvesting schemes, the banking system being owned by the "cult," a Wisconsin election being rigged by dictators in Syria and Korea, a governor's handling of a teacher shortage, and references to a conservative song writer. Detective Berry stated that in his "training and experience," he never saw "an individual correspond with a government body" in this manner and that petitioner was "not really addressing any specific issue."

In one email, petitioner noted the SPD Chief was married and named his wife and his children. Detective Berry testified it appeared petitioner "cut and paste[d]" this information from the Chief's biography on the SPD's website. Detective Berry referenced this communication in his denial letter. He testified "the way that [petitioner] was interacting regarding his permit [application]"

4

caused him concern, as petitioner "was demanding answers" and "wasn't letting the investigative process play out." He also testified petitioner's references to the Chief's family caused him concern.

Detective Berry conceded on cross-examination that Sayreville never told petitioner to stop sending emails. He also acknowledged petitioner was previously approved for a firearms purchaser identification card and had obtained permits to purchase a handgun as recently as 2022. He also testified there was no evidence petitioner had threatened anyone with violence or had any documented mental health issues.

Petitioner testified he is a retired electrician and has owned firearms since 1980. When asked why he sent the numerous emails and documents to Sayreville, petitioner stated they were intended "[t]o notice" Sayreville of "correcting the record," and that his references to the blood of Christ referred to his "religious and spiritual belief[s]."

Petitioner's counsel objected to petitioner having to "explain his religious beliefs." The court overruled the objection. The following colloquy took place between the prosecutor and petitioner:

> Q: Why did you reference the blood of Christ in that --

A: Okay. My belief and according to our government bill of rights, I have the right to whatever religion I want. In my case it's Catholicism . . . . I've gone through all the teachings of the Catholic church.

And in the Catholic church it says that Jesus Christ died on the cross for our sins, which he gave blood. . . .

. . . [B]y doing so, by God giving his son, that all mankind is relieved of sin.

. . . Sin is all debt. Any debt. . . . [A]ll sin is done away with.

Q: . . . So you put that into a document that you intended to persuade all these people that were copied on it and it's directed to. What was the purpose in trying to persuade those people? What were you trying to do?

A: Correct the record.

Q: Correct the record about what? That you overpaid your taxes?

. . . .

A: Overage. To clarify the overage. . . .

Q: Where in this document does it talk about overage and the amounts of money that you went over? And outside of using it to discuss zygotes, placentas, birthday cakes, DNA, where does it say in here the amounts that you . . . overpaid . . . and how it could be accounted for? Where does it say that?

. . . .

6                                    A-0078-23

A:      By the affidavit that I sent.

Q:      Can you point out to us where in this document you discuss the overage?

A:      Not this document, but the [ten] before it.

Q:      Then what was the purpose of this document? . . . Talking about zygotes and things of that nature? Placentas and DNA and birthday cake and the blood of Christ.

A:      It was to educate people . . . in general, along with filing it into the court record . . . .

Q:      Educate people how in terms of your issue that you had?

        . . . .

A:      To inform these people . . . of the case . . . for presenting that document to the court . . . .

Q:      And you think that somehow writing dozens of pages about zygotes and placentas and the blood of Christ would have somehow furthered your cause in terms of getting your money back[?]

A:      It's my religious belief and the ultimate aim is that God, through his son . . . .

Q:      Okay. I'm not asking you about your religious beliefs.  I'm asking you how . . . did this address the specific issue that you had?

        . . . .

A-0078-23

Q: What does a zygote have to do with your tax issue?

A: It has to do with the blood of Christ and the soul and my religious belief, which you're protesting against it when I applied it.

Q: I'm not protesting anything against your religious belief. I'm asking you how you apply your religious beliefs . . . . How does this document further your argument?

A: This document relates to the affidavit which relates to the zygote which God . . . .

THE COURT: We can't mix religion and the court. We've got to separate the two.

THE WITNESS: Well, this is all about religion.

THE COURT: I know it is, but as far as asking people about what their specific religious . . . .

. . . .

THE WITNESS: Maybe I'm answering incorrectly.

THE COURT: No, no. You're answering perfectly . . . . So please just continue. Don't change a thing.

THE WITNESS: Okay. My interpretation of God, the Bible, and Jesus Christ and the transactions they acquired through Pontius Pilate rubbing his hands of the authority that he had over Jesus Christ . . . .

Two people, hopefully married, sleep together. Each one supplies 23 chromosomes each. When the chromosomes meet, this is an event that may start life.

A-0078-23

Until God comes along and breathes the breath of life or the soul into the zygote or the chromosomes, it becomes a zygotes and attaches to the womb. Am I correct?

Q: Okay. Go on.

A: Okay. So eventually, . . . this zygote becomes a baby, a child with a soul. And in the case with Jesus Christ, same thing happened. God gave his son to take away all the sins of humanity, including debt. Debt is a sin.

Q: Okay. You look at this document and . . . [w]ere you trying to get out of the foreclosure, or were you trying to get your money back with this document?

A: No, we were addressing the issue of . . . [o]verage. . . . We were trying to get the end result of what was owed and not owed, okay? And this was an education, along with filing it in the court . . . to correct the record. . . .

Q: I mean, I guess . . . I don't understand your response . . . .

A: It's commonsense. . . . Commonsense and religion.

Petitioner was questioned about a July 29, 2023 fitness for firearms psychiatric evaluation conducted by Jeffrey Ilardi, M.D., a licensed psychiatrist. He noted that Dr. Ilardi performed a psychiatric evaluation and opined petitioner was "very stable, reliable, intelligent and pleasant." Dr. Ilardi further noted petitioner was "psychiatrically cleared," and he was an "appropriate" candidate

9

for a "concealed carry permit." Petitioner's attorney explained in a colloquy with the court that the psychiatric evaluation was submitted in anticipation of denial based on N.J.S.A. 2C:58-3(c)(3),[2] "in response to an allegation of mental health, which [counsel] saw . . . in passing . . . in the denial letter," as the SPD expressed "concerns for mental health."

Petitioner's counsel argued "it sounds . . . like we're hearing . . . [Sayreville] trying to deny [petitioner]'s Second Amendment rights based on his exercise of his First Amendment rights," specifically his "political beliefs," his "religious beliefs," and his "right to seek assistance of the government."

The State argued it was:

> not here because [petitioner] was exercising his rights . . . to express himself in this way. . . . The issue is whether giving him a permit to carry would be contrary to the public's safety, health and welfare.

---

[2] At the time of petitioner's application, N.J.S.A. 2C:58-3(c)(3) prohibited a person from obtaining a permit to carry if they:

> [S]uffer[] from a physical defect or disease which would make it unsafe for him to handle firearms, [or] to any person who has ever been confined for a mental disorder . . . unless . . . the . . . person[] produces a certificate of a medical doctor . . . or psychiatrist licensed in New Jersey . . . that he is no longer suffering from that particular disability in a manner that would interfere with or handicap him in the handling of firearms.

A-0078-23

> If you go through these documents, . . . they make little or no sense without any context. And even when [petitioner] was . . . trying to give context, it didn't make sense in terms of what he was trying to get across to [Sayreville]. It's easy to see how people reviewing his permit application would think that he had some mental health stability issues.
>
> . . . .
>
> And . . . looking at [the email discussing] . . . zygotes and placentas and birthday cake . . . , it makes no sense . . . in terms of what he was trying to get across. And it speaks . . . to his . . . mental stability.
>
> And I understand that he has a permit to purchase and he's got a firearms ID card. But there's a difference when someone has a gun in their house to protect themselves and . . . going out and interacting with the public, with members of the government, with people that he had disputes with.

On August 7, 2023, the trial court issued a written decision and accompanying order denying petitioner's permit to carry a handgun. The court opined "[t]he ultimate issue . . . was whether the State proved by a preponderance of the evidence that [the SPD Chief] had good cause for denying [petitioner]'s application . . . ." The court referenced Detective Berry's September 29, 2022 letter and the correspondence with Sayreville. The court specifically found:

> While initially referencing a tax issue which [petitioner] raised, these emails ultimately gave way to

11

what can only be characterized charitably as the incomprehensible and incoherent musings of an individual who seemingly failed to appreciate both the peculiar and eccentric nature of those communications. A review of these emails, coupled with the testimony [of petitioner] . . . leave little doubt that they are concerning and most certainly a valid basis for denying his application to carry a handgun.

The court further held:

[Petitioner] presented himself as a polite and respectable gentleman who was articulate and professional in his attempts to respond to the State's cross examination questions. However, his testimony was consistent with his email correspondence in that it was incoherent and non-sensical, thus making it difficult for this [c]ourt to support a finding that [petitioner] could formulate the kind of rational thinking expected of individuals permitted to publicly carry firearms. This remains true despite having been originally issued, more than a decade ago, firearms identification cards for several handguns registered to [petitioner]. Whatever his mental status was when these permits were originally issued, during the . . . hearing, and through his email correspondence with [Sayreville], [petitioner] illustrated in clear format that his ability to engage in coherent and rational[] thinking has lessened or been compromised to the extent that his ability to publicly carry a firearm is rightfully a health and safety concern for both [petitioner] and the public. . . . [Petitioner]'s testimony and his email correspondence support a conclusion that granting [petitioner]'s application was not in the best interest of the public health[,] safety, and welfare, and remains so.

Accordingly, I do find that the State has met its burden by proving by a preponderance of the evidence

12

that [the SPD Chief] had good cause for denying [petitioner]'s application.

## II.

On appeal, petitioner argues the trial court failed to find that he lacks "character of temperament" as required for denial under the amended version of N.J.S.A. 2C:58-3(c)(5). He further contends the court erred by ignoring the unrebutted findings of a mental health professional and by substituting its own mental health evaluation thereby circumventing the Legislature's mandate as to how alleged mental health concerns are to be addressed. He further asserts under New York State Rifle & Pistol Association, Inc., v. Bruen,[3] "it is not in our nation's text, history or tradition to deny Second Amendment rights for expressing one's religious and political beliefs, or for petitioning government to redress grievances, [that is] for lawfully exercising First Amendment rights."

A judicial determination that a petitioner poses a threat to the public health, safety, and welfare is a fact-sensitive analysis. In re Forfeiture of Pers. Weapons & Firearms Identification Card belonging to F.M., 225 N.J. 487, 505 (2016). Thus, the scope of our review is limited. "[W]e give deference to the trial court that heard the witnesses, sifted the competing evidence, and made

---

[3] 597 U.S. 1 (2022).

A-0078-23

reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). "Reviewing appellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). However, a "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). "Questions of law receive de novo review." Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017) (citing Manalapan Realty, L.P., 140 N.J. at 378).

Petitioner argues that N.J.S.A. 2C:58-3(c)(5) as amended in December 2022, should apply to his application. He asserts that his emails to Sayreville "allud[ed] to his views on religion and natural philosophy," and he explained to the court that his references to zygotes and placentas were "to educate people." He notes he never threatened anyone, his mental health background check was negative, and he was never told to stop sending emails.

Petitioner asserts Sayreville violated his First Amendment rights and posits "[p]eaceably attempting to resolve a taxation grievance is not a reason to deny Second Amendment rights . . . ." He argues the court "failed to specify how [his] non-threatening expression of his beliefs or petitions to redress grievances with his local government . . . make him a danger to the public health, safety, or welfare," and such a finding "is mere speculation contrary" to this court's holding in One Marlin Rifle.[4]

Petitioner notes Dr. Ilardi opined he was mentally safe to carry a firearm, which was unrebutted by the State. He maintains the "Legislature has clearly delineated . . . how mental health concerns are to be addressed in the context of firearms permit applications," under the amended N.J.S.A. 2C:58-3(c)(3) and, because petitioner was never admitted or committed for mental health reasons, he is not disqualified under the statute from holding a permit to carry.

Petitioner also relies on the United States Supreme Court's decision in Rahimi,[5] which was issued subsequent to the trial court's decision in this matter, arguing he has never had a restraining order entered against him or been found to present a credible threat to another's safety in conjunction with the use,

---

[4] State v. One Marlin Rifle, 319 N.J. Super. 359 (App. Div. 1999).

[5] United States v. Rahimi, 602 U.S. 680 (2024).

15

attempted use, or threatened use of physical force. He argues that because the court did not make findings as required under Rahimi for even temporary disarmament, due process requires reversal.

The State counters petitioner's religious or political beliefs were not the issue before the trial court. Rather, the hearing involved "whether the police chief had properly denied him a gun-carry permit on the grounds it was contrary to the public health, safety and welfare." It contends the statutory disqualifiers in N.J.S.A 2C:58-3(c) "relate to the State's regulation of firearms, not speech." It argues petitioner's speech was not chilled because he "was not deterred from engaging in protected activity by virtue of a government regulation or the threat of prosecution thereunder."

The State contends this court's decision in M.U.[6] defeats petitioner's Bruen claims, and Rahimi supports the trial court's decision. The State asserts the court's denial of petitioner's permit—"based on concern for public safety"—was well-founded, as petitioner's emails show he "failed to not only appreciate the eccentric nature of those communications, but that [he] lacked the ability to engage in coherent thought." It maintains the court's finding that petitioner

---

[6] In re M.U.'s Application for a Handgun Purchase Permit, 475 N.J. Super. 148, 173 (App. Div. 2023).

lacked capacity for "coherent and rational[] thinking" is entitled to deference. It further contends that disqualifying petitioner from carrying a firearm in public is consistent with Rahimi, where the Supreme Court stated "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." 602 U.S. at 693. The State further argues petitioner's psychiatric report, "even if marginally relevant, had no weight" because the psychiatrist never mentioned the email correspondence in his report.

N.J.S.A. 2C:58-4 governs permits to carry a handgun. When petitioner applied for a carry permit in August 2022, and through the SPD's denial of the application, N.J.S.A. 2C:58-4(c) stated:

> No application shall be approved by the chief police officer . . . unless the applicant demonstrates that he is not subject to any of the disabilities set forth in [N.J.S.A. 2C:58-3(c)], that he is thoroughly familiar with the safe handling and use of handguns, and that he has a justifiable need to carry a handgun.

In June 2022, after the Supreme Court's decision in Bruen was issued, the New Jersey Attorney General issued Law Enforcement Directive No. 2022-07, eliminating the "justifiable need" requirement under N.J.S.A. 2C:58-4(c), but clarified "law enforcement agencies must consider all other mandatory requirements for obtaining a carry permit before granting an application," including the disqualifications in N.J.S.A. 2C:58-3(c). Off. of the Att'y Gen.,

17

L. Enf't Directive No. 2022-07, <u>Directive Clarifying Requirements for Carrying</u>

<u>of Firearms in Public</u> 1-2 (June 24, 2022).

At the time of petitioner's application in August 2022, and subsequent

denial by the SPD in September 2022, N.J.S.A. 2C:58-3(c) stated:

> Who may obtain.  No person of good character and good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in this section or other sections of this chapter, shall be denied a permit . . . except as hereinafter set forth.  No . . . permit . . . shall be issued:
>
> 　. . . .
>
> (5) To any person where the issuance would not be in the interest of the public health, safety or welfare.

As stated, N.J.S.A. 2C:58-3(c)(5) was amended in December 2022.  It now

reads:

> Who may obtain.  Except as hereinafter provided, a person shall not be denied a permit . . . unless the person is known in the community . . . as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others, or is subject to any of the disabilities set forth in this section or other sections of this chapter.  A . . . permit . . . shall not be issued:
>
> 　. . . .
>
> (5) To any person where the issuance would not be in the interest of the public

A-0078-23

> health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm.

The amendment was to be effective upon the date of passage.

In M.U., we noted the "substantial change[]" in the statute and determined the law should be applied prospectively. 475 N.J. Super. at 195. Thus, petitioner's application is governed by the prior version of the statute. Ibid.

The public health, safety, and welfare disqualification in N.J.S.A. 2C:58-3(c)(5) "has largely been applied in conjunction with the specific disabilities identified under various subsections of N.J.S.A. 2C:58-3(c), but where the facts do not quite rise to the level of those disabling conditions." M.U., 475 N.J. Super. at 179-80. When an applicant's permit is denied by the chief police officer, the applicant can "request a hearing in the Superior Court." N.J.S.A. 2C:58-4(e); State v. Wade, 476 N.J. Super. 490, 504 (App. Div. 2023). A police chief's denial of an application for a permit to carry is subject to the Law Division's de novo review. In re Osworth, 365 N.J. Super. 72, 77 (App. Div. 2003). "The Chief has the burden of proving the existence of good cause for the denial by a preponderance of the evidence." Ibid. "[I]n evaluating the facts presented by the Chief, and the reasons given for rejection of the application, the court should give appropriate consideration to the Chief's investigative

19

experience and to any expertise he appears to have developed in administering the statute." Weston v. State, 60 N.J. 36, 46 (1972).

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has "recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." Bruen, 597 U.S. at 8 (first citing D.C. v. Heller, 554 U.S. 570 (2008); and then citing McDonald v. Chicago, 561 U.S. 742 (2010)). The "core" of the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Heller, 554 U.S. at 634-35.

The Supreme Court in Bruen expanded Heller's holding when it found the "Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." Bruen, 597 U.S. at 10. The Court in Bruen noted:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this

A-0078-23

Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

[Id. at 17 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 (1961)).]

"Like most rights, the right secured by the Second Amendment is not unlimited." Heller, 554 U.S. at 626. History shows "longstanding prohibitions on the possession of firearms by felons and the mentally ill." Ibid. The Court in Heller "did not cast doubt on such longstanding regulatory measures." McDonald, 561 U.S. at 786. Nor did the Court's decision in Bruen. See Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring).

We rejected a facial challenge to N.J.S.A. 2C:58-3(c)(5) in M.U. 475 N.J. Super. at 190-93. We found the historical record showed "legislatures traditionally imposed status-based restrictions" that were "not limited to individuals who demonstrated a propensity for violence" but "also applied to entire categories of people due to the perceived threat they posed to an orderly society." Id. at 189. We concluded N.J.S.A. 2C:58-3(c)(5) was constitutional on its face. Id. at 190-94. We observed:

Our Supreme Court has explained that the challenged language of "to any person where the issuance would not be in the interest of the public health, safety or welfare" "was intended to relate to cases of individual unfitness, where, though not dealt with in the specific

21

statutory enumerations, the issuance of the permit . . . would nonetheless be contrary to the public interest."

[Id. at 190-91 (quoting Burton v. Sills, 53 N.J. 86, 90-91 (1968)).]

"The Legislature's goal was to keep guns out of the hands of unfit persons," "noncriminal as well as criminal." Id. at 179 (quoting Burton, 53 N.J. at 91, 94).

The United States Supreme Court subsequently considered a facial challenge to 18 U.S.C. § 922(g)(8), which under subsection (C)(i) barred a person from possessing a firearm if a restraining order concluded the person posed "a credible threat to the physical safety" of another. Rahimi, 602 U.S. at 693. The defendant had been involved in multiple violent incidents involving guns, was issued a restraining order against him where the court found he posed a credible threat to another's physical safety, violated the restraining order, and ultimately was indicted for possessing a firearm while subject to a domestic violence restraining order. Id. at 686-89. The "Court did not 'undertake an exhaustive historical analysis,'" and concluded "only" that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." Id. at 702 (quoting Bruen, 597 U.S. at 31). "Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to

others from misusing firearms." Id. at 690. The right to bear arms "was never thought to sweep indiscriminately." Id. at 691.

The Court found 18 U.S.C. § 922(g)(8), including subsection (C)(i), was not only facially constitutional, but was also "constitutional as applied to the facts of [the defendant]'s own case." Id. at 693. It concluded that while it was not suggesting states cannot enact "laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," the statute at issue applied "only once a court has found that the defendant 'represents a credible threat to the physical safety' of another." Id. at 698-99 (quoting 18 U.S.C. § 922(g)(8)(C)(i)). The Court also pointed out 18 U.S.C. § 922(g)(8) had a "limited duration . . . only prohibit[ing] firearm possession so long as the defendant 'is' subject to a restraining order." Ibid. (quoting 18 U.S.C. § 922(g)(8)).

We affirm substantially for the reasons expressed by the trial court. Although the Supreme Court's decision in Rahimi was issued subsequent to the trial court's decision, we are satisfied the court's opinion here was not inconsistent with Rahimi, as the court considered the public safety implications of granting petitioner's application. Moreover, Rahimi did not address the issues confronted by the trial court in this matter. The trial court deemed petitioner's

23

email correspondence[7] with Sayreville "concerning," "incomprehensible[,] and incoherent." It was unconvinced based on those communications—coupled with petitioner's testimony—that petitioner "could formulate the kind of rational thinking expected of individuals permitted to publicly carry firearms." It further held petitioner's "ability to engage in coherent and rational[] thinking" had "lessened or been compromised to the extent that his ability to publicly carry a firearm is rightfully a health and safety concern for both [petitioner] and the public." We conclude the court appropriately analyzed petitioner's communications and testimony, and it did not err in finding that granting petitioner's application was not in the best interest of the public health, safety, and welfare under N.J.S.A. 2C:58-3(c)(5). The court's decision was amply supported by credible evidence in the record, and we discern no basis to disturb those findings on appeal.

We next address petitioner's argument the court erred by ignoring the "unrebutted" findings of his psychiatrist. Although petitioner presented a report

---

[7] We observe petitioner's emails also contained references to: the "Use of the Period After the 'S' in Harry S. Truman's Name"; excerpts from Charles Dickens' novel David Copperfield; the Encyclical of Pope Leo XIII on Capital and Labor; and an article noting the "[t]he CIA ha[d] been taken over by [the] NSA. Basically, everything created by the UK Royals/Crown/Rothschilds was now null [and] void."

A-0078-23

from Dr. Ilardi, who opined petitioner was "psychiatrically stable" and "an appropriate candidate" for a concealed carry permit, the court was not compelled to follow the conclusions of petitioner's expert. Factfinders may use their common sense when determining the weight to give expert testimony. See Torres v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing In re Yaccarino, 117 N.J. 175, 196 (1989)). "[A] factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431 (citing Johnson v. Am. Homestead Mortgage Corp., 306 N.J. Super. 429, 438 (App. Div. 1997)).

Here, the court admitted Dr. Ilardi's report into evidence. Despite Dr. Ilardi's conclusions, the court observed the illogical, convoluted emails— containing references to irrelevant historical, biological, and literary topics— together with petitioner's testimony, demonstrated petitioner was unable to "engage in coherent and rational[] thinking." These emails were not addressed in Dr. Ilardi's report. Therefore, the court did not err in concluding the State had good cause for denying petitioner's application for a permit to carry a handgun because it was not in the best interest of the public health, safety, and welfare.

A-0078-23

To the extent we have not specifically addressed any of petitioner's remaining arguments, we conclude that they are without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division